---
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RECLAIM THE RECORDS and ALEC FERRETTI,<br><br>                    Plaintiffs,<br><br>- against -<br><br>UNITED STATES DEPARTMENT OF STATE,<br><br>                    Defendant. | 23 Civ. 1650 (JPC) |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

August 12, 2024

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiffs*

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiffs*

Plaintiffs Reclaim the Records and Alec Ferretti, by counsel, respectfully submit this reply memorandum of law in further support of its cross-motion for summary judgment.

**I. Preliminary Statement**

Defendant's Reply Memorandum of Law ("Def. Rep.", Dkt. 40) fails to justify Defendant's refusal to conduct a meaningful search in response to Plaintiffs' FOIA request, and the supporting declarations contain misreadings of the request and internal inconsistencies that erode the presumption of good faith generally owed to agency affidavits. By including unrequested paper records in its search analysis, Defendant urges a greatly inflated assessment of the scope of Plaintiffs' request and of the steps required to fulfill it, and relies on this assessment to claim that producing the records would impose an extreme burden on the Department. A plain reading of the request and of Defendant's supporting declarations shows the fundamental error, and creates uncertainty as to the accuracy and applicability of the Department's statements. This uncertainty is amplified by inconsistencies in statements made regarding the operation of the Department database. While the declaration of Plaintiffs' database expert Ron Schnell may be helpful to the Court in parsing these issues, his observations are at such a fundamental level that a simple internet search will confirm the same principles, supporting the Plaintiffs' straightforward observation that a database search would have been effective and should have been conducted here, which Defendant failed to do.

Plaintiffs' cross-motion for summary judgment should be granted on the basis of Defendant's failure to conduct this search, and Defendant should be ordered to produce the requested records.

## II. Argument

**a. Defendant's intentional misreading of the query impugns their agency declarations.**

Plaintiff Ferretti's request specified that it was asking for an extract of all information for deceased passport holders "maintained in the passport database" (Pl. Ex. A, Dkt. 35-1), and, for records of people whose mortality status was uncertain, limited the scope of the search to people born at least one hundred years prior to the date of the search. *Id.* Plaintiff Ferretti also requested the data be provided electronically. *Id.* Clearly, the request was limited to an extract of electronic records, and did not request or even reference paper records at all.

Despite the clear language, Declarant Ballard treated the Department's vast archive of paper records as being included, an error which forms the basis for Defendant's calculation of the labor it contends would be needed to complete the request.[1] To wit: the Supplemental Declaration of Regina L. Ballard ("Ballard Supp. Decl.", Dkt. 41) begins its "Substantial Hardship in Searching For and Collecting Hundreds of Millions of Passport Records" section with the assertion that:

> Because Plaintiffs seek passport records that are over a hundred years old, the Department estimates that hundreds of millions of the documents sought *have not been digitized* and are therefore not retrievable from the Department's Passport Information Electronic Records System ("PIERS").

---

[1] The request includes the verbatim line "please extract data for all people whose date of birth is on or before June 28, 1920 *or the date of processing of this request*, whichever is later." Pl. Ex. A (emphasis added). Obviously, "the date of processing this request" will necessarily be later than 1920, so in the context of the request, which is for deceased passport holders and which references Department policy of considering "all individuals deceased 100 years after their date of birth", *id.*, it is clear that the intended meaning of the phrase italicized above should be "for all people whose date of birth is on or before June 28, 1920 or [100 years before] the date of processing this request". Defendant's moving Memorandum of Law ("Def. Mem.", Dkt. 30) specifically states this as Defendant's understanding, *see* Def. Mem. at 2. However, neither Defendant's Reply Memorandum, the Ballard Declaration nor the Ballard Reply Declaration include the bracketed phrase "[100 years before]". Defendant cannot in good faith now claim to have understood the timespan of the request to include records of anyone with an unknown date of death whose date of birth is more recent than the last 100 years, and the analysis of the search process and the labor burden associated with the request should be read with this understanding.

Ballard Supp. Decl., ¶9 (emphasis added). She continues to describe how the "relevant paper records" (*id.*) would require manual inspection, at a labor cost of hundreds of hours from each of dozens of individuals. *See also* Declaration of Regina L. Ballard ("Ballard Decl.", Dkt. 29), ¶19 ("manually examine every single one of those potentially hundreds of millions *of paper documents* on site") (emphasis added). None of these records were listed in Plaintiffs' request.

Ms. Ballard's calculation of "hundreds of millions" of paper documents also references the 24 million passport books and cards issued by the Department over a 12-month period in 2022-23. Ballard Supp. Decl., ¶9, n. 1. This is irrelevant information. The number of those people who are now deceased and the number who were over a hundred years old at the time of the proposed search would be relevant, but those figures are not provided. Likewise, the estimated figure of "well over 10,000,000 documents" from 1920[2] that appears at the bottom of the same note is irrelevant as it fails to note whether any of those documents are part of the PIERS database.

The next section in the Ballard Supplemental Declaration, "Substantial Hardship in Producing Hundreds of Millions of Passport Records", begins with the assertion that "[t]he first step involved in processing and producing *any paper passport record yet to be digitized* would be to copy it." (Ballard Supp. Decl, ¶12; emphasis added.) This also seeks to include the labor of processing non-requested records in calculating the time involved, which Ms. Ballard estimates as "decades of work" (*id.*, ¶15).

---

[2] Declarant Ballard's estimate of 5% of the U.S. population applying for a passport in 1920 should also be examined in the historical context that until 1941, a passport was not required for U.S. citizens travelling abroad, with the exception of eight months during the Civil War (August 19, 1861–March 17, 1862) and during World War I (May 22, 1918–1921). *See* National Archives, "Passport Applications, 1795-1925", *available at* https://www.archives.gov/files/research/naturalization/400-passports.pdf (accessed August 12, 2024). Thus, for many of the years at issue here, far fewer passports were issued than are today.

Also, the Department's FOIA website notes that passport records prior to 1925 are not maintained by the Department, but are at the National Archive and Records Administration, a separate Federal agency, further reducing the potential size of the records subject to search here and bringing into question the actual number of records at issue. *See* https://foia.state.gov/Request/FOIA.aspx  (accessed August 12, 2024).

These misrepresentations by the declarant about what would be needed to fulfill Plaintiffs' request and the agency resources needed to do so call into question the "presumption of good faith" accorded to agency affidavits, *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994), and may be adequate "to impugn the agency's affidavits" in a showing that "summary judgment is … inappropriate." *ACLU Immigrants' Rts. Project v. United States Immigr. & Customs Enf't*, 58 F.4th 643, 646 (2d Cir. 2023). Indeed, the Defendant's Reply Memorandum heavily relies on the Ballard miscalculations, using them to argue that the burden on the Department justifies declining to conduct any search here. *See* Def. Rep. at 6 ("responding to Plaintiffs' request would require the Department to search for and collect 'hundreds of millions' of paper passport records"); *id*. at 7 ("the Department would need to digitize countless paper records"); *id.* at 8 ("searching paper records would take dozens of individuals hundreds of hours"). This is a misleading calculus of the work required here.

The only discernible rationale offered for searching the paper records appears in the Ballard Supplemental Declaration at ¶13, where she asserts that if an electronic record is illegible, "a Department employee would need to coordinate with the Records Center to manually search boxes there to locate the relevant paper records" in order to determine its content. Nowhere in Defendant's papers, however, is the magnitude of this problem demonstrated, nor is there any explanation as to why the record reference could not simply be marked "ILLEGIBLE", or left blank altogether.

Defendant here appears to be describing a search, and the labor required to do it, far larger than can be explained by the query itself, eroding the presumption of good faith owed to the agency declarant and diminishing the value of the Ballard Supplemental Declaration.

b. **Defendant's declarations contain inconsistencies, creating questions of fact.**

Defendant relies on two purported limitations to the operation of the Department database to avoid producing the requested records. Each of these – the inability of the interface to execute a search query due to the presence of images in the database, and the inability to export bulk data above a certain number of records – is inconsistent with other declaration statements or other information coming from Defendant, undermining the certainty of the declarations.

Defendant argues that because the Department database stores images of records, data cannot be queried and retrieved from it in the same manner as in other databases. *See* Def. Rep. at 5; Reply Declaration of Sharon Westmark ("Westmark Decl."; Dkt. 42) at ¶¶8-10. Defendant's explanation there seems to imply that the data the images contain, such as name of applicant, date of birth, place of birth, etc., can only be found in the images themselves and cannot be searched for as alphanumerical data responsive to a search query. This is plainly at odds with the Department's ability to search by personal identifiable information ("PII")[3], *see* Ballard Decl. at ¶10; Westmark Decl. at ¶7. It is further undermined by the Department's own description of the PIERS system, in the PIERS Privacy Impact Assessment ("PIA"), that "PIERS provides structured query capabilities to the data maintained within its environment," *i.e.*, it allows the use of search queries. Dkt. 35-3, p. 1.[4] Additionally, Ballard acknowledges that most of the "data that would be responsive to this request had been entered manually", Ballard Supp. Decl., ¶13, so would therefore be searchable *as data* rather than as images. The inclusion of images in the PIERS

---

[3] Oddly, the Ballard Declaration asserts that "[t]he passport data maintained by the Department does not contain information about whether an individual is deceased", Ballard Decl. at ¶10, but two sentences later states that the database can be searched by a person's "date of death, or place of death" (*id*.). Not only is this a contradiction, but it involves a key query term for limiting a search to deceased people only.

[4] "Structured query capabilities" refers to the use of Structured Query Language ("SQL") in the operation of the PIERS database, which allows for complex database management tasks including data retrieval, access control and data sharing. *See* Tim Mucci, "What is structured query language (SQL)", https://www.ibm.com/think/topics/structured-query-language (accessed August 10, 2024).

database may or may not be unique to that system, but Defendant has not explained why the presence of images prevents the retrieval of alphanumeric data through standard SQL search queries in response to Plaintiffs' request.

Defendant also emphasizes the PIERS front-end limitation of 250 records per request, arguing that this precludes a full export of database records and would require excessive labor inputs. *See* Ballard Decl. at ¶¶10, 20; Westmark Decl. at ¶7. Defendant also acknowledges that this limitation can be sidestepped by using a database query to pull data directly from PIERS independent of the front-end user interface, *see* Ballard Decl. ¶21; Westmark Decl. ¶10 (discussing "referencing and joining data stored across multiple repositories", i.e., designing and executing a search query, as well as the support needed "when retrieving large data sets"); *see also* Plaintiffs' Memorandum of Law (Dkt. 37) at 8-10. Although Defendant asserts concerns relating to the bulk export of PIERS data, the fact that it can be and has been done raises questions about the accuracy and reliability of Defendant's calculations of the labor required when using a search technique beset by avoidable limitations.

Taken together, these contradictions and inconsistencies present questions of fact that make summary judgment for Defendant inappropriate at this stage.

   **c. Defendant's purported need for verification lacks specificity and is of Defendant's own creation.**

Defendant argues that potential errors in the passport records could implicate the privacy expectations of living persons and therefore require that every such record be individually verified prior to being produced, at a huge labor expense. Def. Rep. at 8. The particular scenarios posited, involving living people's PII being misstated and subsequently released with the records of dead people, are speculative – "it is possible … It is also possible…". *Id*. Being possible isn't enough; a showing is needed that this actually happens, and nowhere in Defendant's papers do they provide

6

any hard statistics, or even an approximation, of how many records contain errors or the specificity and gravity of any errors, only that such errors are possible due to the manner in which the data was entered into the Department database. The papers lack the "reasonable specificity of detail" required of agency affidavits on a motion for summary judgment. *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 478 (2d Cir., 1999).

Further, because "[m]ost electronic passport data that would be responsive to this request had been entered manually", Ballard Supp. Decl. at ¶13, any errors present in the database stem from problems with the manual entry of the data by the Department that persist, uncorrected. Defendant should not be able to rely on errors of their own making to withhold responsive records.

Plaintiffs' citation to *Reclaim the Records v. Department of Veterans Affairs*, 18 Civ. 8449 (PAE), 2020 WL 1435220, *2020 U.S. DIST. LEXIS 53844 (S.D.N.Y. Mar. 24, 2020) is persuasive here. In that case, the Veterans Administration chose to withhold production of deceased veterans' benefits information on the excuse that the records in the file contained a very high and specifically enumerated percentage of significant errors, including as to whether a given veteran was actually deceased. Judge Engelmayer ordered the full set of records to be released, reasoning that any Exemption 6 substantial privacy interests that may have been implicated by the release of erroneous data were outweighed by the public value of releasing such records.[5] *See id*. at *30-31. Here, where Defendant has not quantified the degree to which any errors permeate the passport records or the actual nature of the errors, but only speculates on potential errors, more should be shown before summary judgment is deemed appropriate.

---

[5] Here, Defendant cites no statutory exemptions protecting the requested data from production, as it must, *Knight First Amendment Inst. v. United States Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir., 2022) ("Agencies are required to disclose requested documents unless they fall within an enumerated exemption"), but attempts to dodge its obligation by making irrelevant or unsubstantiated claims of the labor input that disclosure would require.

7

Defendant's papers show a significant overestimation of the records requested and of the work needed to produce those records, inconsistent assertions about the capacities of the PIERS database, and inadequate information about the nature, frequency and gravity of any errors introduced by Department staff which would necessitate the extreme labor inputs suggested by Defendant's brief. No actual search calculated to locate responsive database records was performed, and Plaintiffs' cross-motion should be granted.

**d. The expert testimony of Ron Schnell is helpful to the Court and should be considered.**

Plaintiffs' Declarant Ron Schnell's expert testimony is being offered to provide useful examples of how structured search queries can be composed in a way that would obtain the kind of data being sought and would not create an undue burden on the Department. For these limited but useful purposes, discussed in Plaintiffs' Memorandum at pp. 6-8, the Declaration of Ron Schnell ("Schnell Decl.", Dkt. 36) may be considered on this cross-motion.

Specifically, Mr. Schnell's declaration identifies sample database queries which would gather information from a passport database according to the criteria in the request, such as all data from records where the date of birth is recorded as more than 100 years earlier (Schnell Decl., ¶17), and would limit information gathered to where the person is deceased (*id.*, ¶18). He also shows how the data retrieved can be limited to certain categories, such as birth and death dates, passport number, and country of birth, while omitting categories that are restricted or not wanted, such as Social Security numbers (*id.*, ¶24). Taken together, these sample queries are of the type that could pull information responsive to Plaintiffs' query from the Department database (*id.,* ¶27).

While Mr. Schnell's declaration may be helpful to the Court in understanding the operation of databases using SQL queries, the substantive technical information informing his opinions is so fundamental that a cursory internet search will confirm the same principles (*see* page 5, n. 4, *infra*), supporting Plaintiffs' view that a database search would have been effective here.

### III. Conclusion

While Agency affidavits are entitled to a presumption of good faith, deficits such as those outlined above create questions about the adequacy of the Agency explanations provided for Defendant's course of action pursuant to this request. Because Defendant's estimates of the production burden involved are based on greatly inflated factors not presented by the request, their observations about the operation of the PIERS database are inconsistent, and their concerns about the release of data are grounded on speculative harms rather than stated facts, the drastic remedy of summary judgment and dismissal is inappropriate.

Defendant's motion for summary judgment should be denied. Defendant has not shown that it conducted a reasonable search calculated to locate responsive records, and failed to meet its threshold burden of resolving any ambiguities or factual uncertainties. For the reasons outlined herein, Defendant's motion should be denied and Plaintiffs' cross-motion granted.

Dated:        August 12, 2024
              New York, New York

                                            Respectfully submitted,

                                            BELDOCK LEVINE & HOFFMAN, LLP
                                            99 Park Avenue, PH/26th Floor
                                            New York, New York 10016
                                            *Attorneys for Plaintiff*

                                            By:  /s/ Benjamin Meyers
                                            Benjamin Meyers, Of Counsel
                                            t: 646-496-2353
                                            e: ben.meyers.esq@proton.me

                                            David B. Rankin
                                            t: 212-277-5825
                                            e: drankin@blhny.com